## CASE OF THE MECHANICS' FIRE INSURANCE COMPANY.

*Supreme Court, First District; Special Term, September,* 1857.

FIRE INSURANCE COMPANY.—PROCEEDINGS TO DISSOLVE.—
ATTORNEY-GENERAL.

The attorney-general has no power to discontinue proceedings instituted by him under Laws of 1853, 918, ch. 466, § 24, to close the business of a fire insurance company.

So far as there exists a discretionary power to institute and control these proceedings, it is vested in the comptroller of the State, and not in the attorney-general.

The provisions of the constitution relative to trial by jury do not apply to proceedings to close the business of a corporation on the ground of *insolvency.*

Under the practice of the Supreme Court, a receiver appointed in proceedings taken under Laws of 1853, 918, ch. 466, § 24, to close the business of a fire insurance company, should be required to give security.

Motion to confirm the report of a referee.

The facts appear in the opinion of the court.

MITCHELL, J.—On November 28, 1855, W. Barnes, appointed by the comptroller of the State to investigate the affairs of the

Mechanics' Fire Insurance Company, reported to that officer, who thereupon communicated to the attorney-general the result, and that he deemed the assets of the company insufficient to justify its continuance in business (*Laws of* 1853, *ch.* 466, § 24). The attorney-general then presented his petition to this court, that the company be required to show cause why its business should not be closed. Such order was granted on December 1, 1855, to show cause on the 8th, with a temporary injunction. On the 7th, the order was amended so as to make it returnable on that day. Mr. Whitehead appeared for the company, and admitted due service of a copy of the last order. On the same day, on hearing Mr. Whitehead and Mr. J. Blunt for the company and Mr. Lathrop for the people, an order was made decreeing that "*the company be and the same is hereby dissolved.*" An injunction was granted, and Mr. John Jay was appointed receiver (security being waived).

On the 24th of the same month, an order was made ratifying an agreement made conditionally by the receiver with The Equitable Insurance Company of London, transferring to it the outstanding policies of this company. On October 30, 1856, the receiver was authorized to commence or continue suits to collect various claims in favor of the company.

On June 19, 1856, an order was made for the attorney-general and the receiver to show cause why the order of December 7, 1855, appointing a receiver and dissolving the company, should not be reconsidered and set aside. This was on the petition of De Groot and Dawson, accompanied by affidavits of several stockholders, and was on the ground that the receiver gave no bond; that the company was in fact possessed of a *bona fide* capital of $150,000; that the counsel of the company (the present receiver) not having a due estimate of the value of the assets of the company, and believing the credit of the company was much injured by the publication of the report made to the comptroller, permitted the order to be entered without opposition; that the said counsel did not apply to either of the petitioners, or to any persons to their knowledge, for affidavits to oppose the application. A schedule was annexed, showing the assets of the company estimated at $169,000, assuming all the debts due to it to be good—its debts at $5,000, besides the capital belonging to the stockholders.

On July 2, 1856, an order was made on the above petition, after hearing counsel for the various parties, declaring that the court had full power and jurisdiction to make the original order to show cause, of December 1, 1855, and referring it to Charles Edwards to ascertain and report whether the assets and funds of the company then, or at the time of instituting these proceedings, were sufficient to justify the continuance in business of the company, or whether the interests of the public required a dissolution of the company, &c.

On October 7, 1856, the receiver moved for leave to sell mortgaged premises under judgments obtained by him as receiver. The stockholders opposed. The order was denied, with a proviso that, unless the stockholders should obtain the report of the referee on their petition within two months, the receiver should proceed and sell. On November 12, 1856, the receiver obtained a positive order to sell in another like case.

On December 6, 1856, an order was granted, on the application of Lawrence & Thorn, counsel for opposing stockholders, that the receiver show cause why he should not be enjoined from acting until he file security; and why the sale by him of mortgaged premises should not be stayed until the coming in of the referee's report; and why he should not deposit the cash in his hands in some trust company, &c.

In pursuance of that order, it was ordered on January 29, 1857, that the receiver file a bond, with one surety to be approved, for $15,000, and that sales by him of mortgaged premises be suspended for six weeks, unless the reference be sooner closed, and that all moneys received or to be received by him be deposited in the New York Life Insurance & Trust Company. This order was entered on the application of Messrs. Lawrence & Thorn.

On the same day an order was made for those stockholders to show cause why the order of reference should not be vacated, and the original order dissolving the company be confirmed, or said order be so modified as to allow the immediate settlement of the debts of the company. The hearing of that order was referred to William Kent, Esq., on February 21, 1857.

On March 12, 1857, an order was granted for the receiver to show cause why sales by him should not be suspended until the coming in of the referee's report.

Case of the Mechanics' Fire Insurance Company.

On November 12, 1856, an order was made allowing the receiver to appear before the referee and sustain, by proof, the insufficiency of the assets of the company.

In March, 1857, Mr. Chatfield, for the attorney-general, moved that the receiver show cause why the last order should not be vacated, as granted without notice to him. On April 2, 1857, that motion was decided by declaring that nothing contained in the former order should affect the power of the attorney-general to control and direct the prosecution of the reference, nor should this last order in any manner affect the regularity of the proceedings before the referee, Charles Edwards, Esq.

On April 7, 1857, the order of November 10, 1856, was suspended until the further order of the court. The referee states that on July 2, 1856, an order had been made, also referring it to him to take proof of all facts as to the legality of the appointment of Mr. Jay as receiver; but the order of that date annexed to his report has no such clause.

On May 7, 1857, the referee made his report, that the assets of the company were insufficient for it to do business; that of its capital of $150,000, the sum of $102,000 was in mortgages of $300 each on lots in Kings County under water, and of no present marketable value; and that no proof was given of the solvency of any of the obligors in the bonds.

Now, on a motion to confirm the referee's report, and declare the company dissolved, Mr. Latson, counsel for some of the stockholders, produces a notice to him, dated June 4, 1857, signed "S. B. Cushing, attorney-general, by L. S. Chatfield, special deputy," that the proceedings against the company are discontinued, and that the people make no claim against the said company. But neither Mr. Chatfield nor the attorney-general appeared in court, or filed or offered to file any consent that the proceedings be discontinued, although the motion was postponed several times on the motion of counsel for some stockholders, that one of them might appear.

The case, then, briefly is, that the comptroller had caused an investigation to be made into the affairs of this company, and that it appeared to him that the assets of the company were insufficient to justify the continuance of its business; that he communicated this fact to the attorney-general, "*whose duty* it then became to apply to the Supreme Court for an order requi-

ring them (the company) to show cause why the business of such company should not be closed" (*Laws of* 1853, 918); that the attorney-general made such application, and gave notice to the regular counsel of the company; that the counsel appeared by consent on a day prior to that appointed for showing cause, and on like consent the time was altered: he acting in good faith, and, as he believed, for the interests of the stockholders, as may be inferred from the statements of the remonstrants. That the counsel for the company and the attorney-general were then heard, and the court granted the order that " the company be and the same is hereby dissolved ;" that an injunction was granted, and a receiver appointed, who has made contracts assigning the policies to another company, under the order of the court, and has commenced the foreclosure of mortgages, and sold in one case. There was then a dissolution of the company adjudged by the court in conformity to the statute, and that order stands in full force, and has never been appealed from. The act, however, under which this proceeding was had gave the court power also to refer the application of the attorney-general to a referee to inquire and report upon the facts. On the application of some stockholders (but not on the application of the company), a reference was ordered, nearly six months after the order of dissolution was made, affirming the full power and jurisdiction of the court in making the first order, but referring it to Charles Edwards, Esq., to ascertain whether the funds of the company were sufficient to justify its continuance in business. There is no express power given to the court in the statute to make this inquiry *after* the order of dissolution is made ; if it exists, it is under the general power of the court. The power given by the *statute*, if exercised, is from its nature to be exercised before the adjustment is made. The new reference was therefore an appeal to the equitable powers of the court, that it might ascertain whether the facts on which the first order was made really existed, and that was the whole object of them. Then, if it should be found that there was a mistake in fact in this respect, the parties could move to open the first order ; and then the question would arise whether the court had power to do so, and whether it was proper to do it. The report shows that there was no mistake in fact ; that on investigation, and hearing the remonstrants and their opponents du-

ring such parts of nearly a year as they chose to give to the case, the referee reported against the company, and nothing is submitted to the court to throw a suspicion on the correctness of this conclusion. After the judgment of dissolution was made, it was too late for the attorney-general or the comptroller to vacate that judgment without the consent of the court, and on notice to the parties interested. The receiver, as assignee of the effects of the company, was interested in the question: the company (if it could have still any existence) was also interested, as were also the creditors and all stockholders, except the remonstrants. The court would not consider it necessary to notify creditors or stockholders, because they are represented by the receiver sufficiently, whose duty it is to protect their interests; but still it will notice the fact that their interests may be opposed to a revival of the company, and therefore would not allow a judgment, that may be in their favor, to be vacated on the motion of any single party, even if it were the attorney-general, but would first see what justice to all parties required before vacating that judgment under which others had acquired rights. No reason now appears for vacating it; but, on the contrary, the report re-establishes the facts which show its propriety.

But if the judgment or order had not been entered, and the question was now whether it should for the first time be made, it would be proper now to make the order. Assuming (what is very uncertain) that the attorney-general meant by the notice given by him to discontinue these proceedings, he had no power to do so against the instructions of the comptroller on the record in this matter. However broad may be his power in other cases, and although the court may in them assume that he acts according to the wishes of the public officers whom he represents, in this case he has but a special power, prescribed in this very act. The comptroller alone is the officer of the State who is to watch over these institutions, and protect the public against them. He alone is to exercise his judgment, after receiving such aids as he may desire; and he alone of the executive officers is to determine " when it shall appear to him that the assets of any insurance company, incorporated in this State, are insufficient to justify the continuance in business of any such company;" he then is to communicate this fact to the attorney-general. That officer is then to receive this as a fact

established, so far as the public are interested ; and he is then not to assume the contrary, and has no power to do so; but is to proceed before the court, and establish the fact thus alleged by the proper public officer. The act in precise language makes this last his duty, and precludes any discretion in him to pursue a different course ; at least, while the " communication" from the comptroller, which is his sole power of attorney, remains in force. The act, speaking of the attorney-general, says : " *whose duty* it shall then become to apply to the Supreme Court for an order requiring them to show cause why the business of such company should not be closed" (*Laws of* 1853, 918, *ch.* 466, § 24). The attorney-general could not present to the court the communication of the comptroller, and obtain the order to show cause, and then say that he chose to disregard it, and would of his own will do so. The record of the court would show (as it now does) that this was contrary to the instructions of his principal—contrary to the special power conferred upon him. Not only is the judgment of the comptroller to control (so far as the people on their side are concerned), as to the dissolution of the company under section 24, but also in the initiation of the existence of the company. Under section 10 (*Laws of* 1853, 908, *ch.* 466), he is the officer who (personally, or by agents to be appointed by him) is to ascertain that the capital required by the act " has been paid in and is possessed by the company in money, or in such stocks, bonds, and mortgages as are required by section 8 of this act ;" or if a mutual insurance company, that it has been secured as required by that act. The corporators are then to give a certificate, which is to be filed with the same officer (the comptroller), and he is then to deliver to the company a certified copy of its charter. The effect of the act is to throw on the comptroller the exclusive responsibility of giving life to these companies, and of determining when it is proper to apply to the courts to take that life away ; and to make the attorney-general his assistant to carry out the views of the comptroller, and not to substitute his own. The attorney-general cannot therefore (without the record evidence of the consent of the comptroller) discontinue these proceedings, even before judgment of dissolution, after the " communication" of the comptroller is once filed with the court, and the order to show cause is granted on it.

It is objected that a corporation can be dissolved only by *quo warranto*, or an action under the Code of like effect. The Legislature may alter the form of remedies as it pleases, subject only to constitutional restrictions. The provisions of the constitution as to trial by jury do not apply, as this is a proceeding on account of *insolvency*, which has been generally prosecuted in a summary way, or before the Court of Chancery. (See Revised Statutes, and the opinion as to Empire City Bank, delivered at this term.) In the opinion last referred to, most, if not all, of the objections of a general nature raised here are noticed.

The receiver did not give security at first. It was waived, and this act does not require it. It was proper to require it under the general practice of the court, and it was afterwards given.

The report of the referee should be confirmed, and the order declaring the company insolvent and dissolved, be declared to be valid and binding; and that the company is dissolved and was dissolved on the day of that order.